United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 26, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 06-50160

———————————

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JACOB PIERCE FINLEY

Defendant - Appellant

———————————————————————————————————

Appeal from the United States District Court
for the Western District of Texas, Midland
No. 7:05-CR-170-2

———————————————————————————————————

Before KING, WIENER, and CLEMENT, Circuit Judges.

KING, Circuit Judge:

Defendant-appellant Jacob Pierce Finley appeals his conviction on one count of aiding and abetting possession with intent to distribute a controlled substance (methamphetamine) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He argues, inter alia, that the district court erred by not instructing the jury as to simple possession of methamphetamine and by denying his motion to suppress text messages and call records recovered in a warrantless, post-arrest search of his cell phone. For the reasons that follow, we AFFIRM.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On August 19, 2005, officers with the Midland, Texas Police Department ("MPD"), working in conjunction with the Drug Enforcement Administration ("DEA"), conducted a controlled purchase of methamphetamine from Mark Brown. Amy Stratton, a cooperating source acting under the direction of the MPD, called Brown to arrange a methamphetamine deal. Stratton and Brown agreed that Stratton would purchase approximately six grams of methamphetamine for $600. Brown requested that Stratton travel to his residence to buy the narcotics, but at the direction of the police Stratton informed Brown that she was at a truck stop in Midland and that she had no transportation to get to Brown's home. Brown agreed to meet Stratton at the truck stop. The police drove Stratton to the truck stop and gave her $600 in marked bills.

Brown asked defendant-appellant Jacob Pierce Finley to drive him to the truck stop, and Finley agreed to do so. Driving his white Southwest Plumbing van——Southwest Plumbing was Finley's uncle's company and was also Finley's employer——Finley picked Brown up at Brown's residence and drove him to the truck stop. Once they arrived, Stratton approached the van's passenger side where Brown was sitting. Stratton gave Brown the $600 in marked bills, and Brown gave Stratton a cigarette package. Tucked inside the clear wrapper surrounding the cigarette package was a

plastic bag containing a white crystalline substance; laboratory analysis of this substance later revealed that it was a 3.1-gram mixture containing 1.4 grams of pure methamphetamine.

Finley then drove away from the truck stop; neither he nor Brown ever exited the van while there. MPD officers waiting nearby performed a traffic stop on the van approximately three to five miles from the truck stop. Once Finley and Brown were detained, the police searched the van and found the same marked bills used in the transaction in a trash can located between the driver's and passenger's seats.

The police also found two medicine bottles in the trash can, one with an orange cap and the other with a white cap. In the orange-capped bottle were five small plastic bags, two of which contained a white crystalline substance; laboratory analysis of this substance later revealed that in total it was a 2.6-gram mixture that included 1.5 grams of pure methamphetamine. The white-capped bottle had a label with the name "Finley" on it. In this bottle were a small, homemade, glass smoking pipe with methamphetamine residue in it and a small piece of straw that could be used to snort methamphetamine. Also inside the bottle was a plastic bag containing a white crystalline substance; laboratory analysis of the substance revealed that it was 1.6 grams of dimethyl sulfone, a substance similar in appearance to methamphetamine that methamphetamine dealers commonly use to "cut" or add bulk to pure methamphetamine.

The police arrested Finley and Brown at the scene of the traffic stop. They searched Finley's person and seized a cell phone that was located in his pocket. The phone belonged to Southwest Plumbing and had been issued to Finley for work, but Finley was permitted to use the phone for personal purposes as well.

MPD officers transported Finley and Brown to Brown's residence, where other MPD officers and DEA agents were conducting a search pursuant to a warrant.[1] DEA Special Agent Dean Cook and MPD Sergeant Russell interviewed Finley outside the home. Finley admitted to some past cocaine and methamphetamine use, including some methamphetamine he received from Brown three days prior. He also admitted to getting his friends marijuana from Brown on numerous occasions. But he denied any involvement in the sale of methamphetamine to Stratton.

During the questioning, an MPD officer handed Finley's cell phone to Special Agent Cook. Special Agent Cook searched through the phone's call records and text messages; several of the text messages appeared to him to be related to narcotics use and trafficking.[2] After Special Agent Cook and Sergeant Russell

---

[1] An MPD detective had already obtained the warrant based on two prior August 2005 controlled methamphetamine transactions between Brown and Stratton. Finley was not involved in either of these previous transactions.

[2] For example, an incoming text message stated, "Call Mark I need a 50." Special Agent Cook, who was qualified as an expert in narcotics trafficking and in the investigation of narcotics,

confronted Finley with some of the text messages, Finley averred that most of the messages referred to marijuana, not methamphetamine, and he admitted to distributing marijuana at least once.

The grand jury charged Brown and Finley in a one-count indictment with possession with intent to distribute methamphetamine, aided and abetted by each other, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Brown pleaded "guilty" pursuant to a plea agreement. Finley pleaded "not guilty" and proceeded to a jury trial.

The government argued at trial that Finley knowingly drove Brown to the truck stop so that Brown could sell methamphetamine to Stratton and that Finley therefore aided and abetted Brown's possession with intent to distribute methamphetamine. Finley's defense was that, even though he in fact aided and abetted Brown, he did not do so knowingly because he did not know that the purpose of the trip to the truck stop was to sell methamphetamine.

_____

testified at trial that "50" probably refers to fifty dollars' worth of some narcotic. Another incoming message asked, "So u wanna get some frozen agua[?]" Special Agent Cook testified that "frozen agua" likely referred to "ice," a common term for methamphetamine. And an outgoing text message asked, "Any chance I could use ur digitals real quik[?]" Special Agent Cook testified that "digitals" probably referred to digital scales, which narcotics dealers commonly use to weigh their goods. There were several other text messages seemingly related to narcotics use and trafficking that were admitted into evidence and that Special Agent Cook discussed at trial.

Brown testified that during the approximately six-month period prior to his arrest, he was in daily contact with Finley. Brown also testified that Finley had purchased methamphetamine from him five to ten times and that Finley distributed some of the methamphetamine he bought from Brown. Brown alleged that on August 19, 2005, Finley contacted him to purchase methamphetamine, that Brown told Finley he needed a ride to the truck stop to drop off methamphetamine, and that Finley agreed to give him a ride in exchange for a little extra methamphetamine. According to Brown's testimony, when Finley picked him up he gave Finley 0.3 grams of methamphetamine, which included 0.1 extra grams in exchange for the ride. On cross examination, Brown acknowledged that after his arrest he told MPD officers, inter alia, that he asked Finley to take him to the truck stop to purchase cigarettes.

Finley testified that Brown asked him for a ride to get some cigarettes and that he agreed to take him to the truck stop. He averred that he had not known of the real purpose for the trip until after the drug transaction had occurred.

The jury convicted Finley, and he now appeals.

## II. LESSER-INCLUDED-OFFENSE INSTRUCTION

Finley first contends that the district court erred in refusing his request for a lesser-included-offense instruction.

Finley requested that the jury be permitted to consider, in addition to possession with intent to distribute, the lesser offense of simple possession of a controlled substance. The district court denied Finley's request.

**A. Background**

Rule 31(c)(1) of the Federal Rules of Criminal Procedure provides that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." The defendant is afforded this protection "to prevent juries from improperly resolving their doubts in favor of conviction when one or more of the elements of the charged offense remain unproven, but the defendant seems plainly guilty of some offense." United States v. Harrison, 55 F.3d 163, 166 (5th Cir. 1995) (quoting United States v. Browner, 889 F.2d 549, 551 (5th Cir. 1989)).

A defendant is entitled to a lesser-included-offense instruction if (1) the elements of the lesser offense are a subset of the elements of the charged offense and (2) the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him of the greater. Id. (quoting Browner, 889 F.2d at 550-51). "While a defendant's request for a lesser included offense charge should be freely granted, there must be a rational basis for the lesser charge and it cannot serve merely as 'a device for [the]

defendant to invoke the mercy-dispensing prerogative of the jury.'" United States v. Collins, 690 F.2d 431, 438 (5th Cir. 1982) (quoting United States v. Sinclair, 444 F.2d 888, 890 (D.C. Cir. 1971)).

A lesser-included-offense instruction "is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses." Sansone v. United States, 380 U.S. 343, 349 (1965). It is only proper where the additional element required for the greater offense is actually in dispute. Id. Otherwise, the jury would effectively be permitted "to determine the punishment to be imposed, a duty Congress has traditionally left to the judge." Id. at 350 n.6.

## B. Standard of Review

We review the district court's determination on the first prong of the above two-part test (whether the lesser offense is included in the greater offense) de novo. See Harrison, 55 F.3d at 167. We review the court's determination on the second prong (whether a jury could rationally acquit on the greater offense yet convict on the lesser) for abuse of discretion. See id.

## C. Analysis

Finley asserts that the first prong is satisfied because simple possession of a controlled substance is a lesser included

offense of possession with intent to distribute.  He argues that the second prong is satisfied because (1) a jury could rationally have acquitted him of possession with intent to distribute had it believed Finley's testimony that he did not know the purpose of the truck-stop trip and disbelieved Brown's testimony to the contrary and (2) a jury could also have rationally convicted him of simple possession of methamphetamine if, based on the methamphetamine found in the pill bottles, it had believed Brown's testimony that he gave Finley methamphetamine in the van and disbelieved Finley's testimony that none of the methamphetamine in the van belonged to him.

We need not address Finley's argument under the second prong because he mistakenly assumes under the first prong that simple possession of the methamphetamine in the pill bottle is a lesser included offense of possession with intent to distribute the methamphetamine in the cigarette package.  It is not; they are two separate, independent offenses.

"One offense is necessarily included in another if it is impossible to commit the greater without also having committed the lesser."  3 CHARLES ALAN WRIGHT, NANCY J. KING, & SUSAN R. KLEIN, FEDERAL PRACTICE AND PROCEDURE § 515 (3d ed. 2004).  "This rule is an application of the familiar Blockburger elements test, which the [Supreme] Court has adopted to determine when offenses are the 'same' under the Double Jeopardy Clause."  Id.; see also Rutledge v. United States, 517 U.S. 292, 297 (1996).

It is well established that, in the abstract, simple possession of a controlled substance under 21 U.S.C. § 844(a) is a lesser included offense of possession with intent to distribute under 21 U.S.C. § 841(a)(1). United States v. Lucien, 61 F.3d 366, 372-74 (5th Cir. 1995). But under the Blockburger rule, possession with intent to distribute and simple possession constitute only one offense only where "the same act or transaction constitutes a violation" of both § 841(a)(1) and § 844(a). Rutledge, 517 U.S. at 297 (emphasis added) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). If, however, the greater offense of possession with intent to distribute and the lesser offense of simple possession arise out of two separate acts, and not "the same act or transaction," then the lesser offense is not included in the greater. See Blockburger, 284 U.S. at 301-03 (holding that two unlawful sales of narcotics to the same purchaser on consecutive days constituted two offenses, punishable separately).

In United States v. Johnson, the defendant was convicted of one count of possession of amphetamine in violation of § 844(a) and a separate count of possession with intent to distribute amphetamine in violation of § 841(a)(1) and 18 U.S.C. § 2. 977 F.2d 1360, 1373 (10th Cir. 1992). The defendant argued that his multiple convictions for amphetamine possession violated the Double Jeopardy Clause because they arose out of a single course of conduct. Id. at 1371. But the court disagreed. The court

-10-

acknowledged that "as to a single cache of drugs, simple possession under § 844(a) is a lesser included offense of possession with intent to distribute under § 841(a)(1)." Id. at 1373 (emphasis added) (citing Brown v. Ohio, 432 U.S. 161, 169 (1977); United States v. Burns, 624 F.2d 95 (10th Cir. 1980)). But it reasoned that the situation in that case differed because the amphetamine was found in two separate stashes and each stash was intended for a different purpose or transaction; one stash was intended for personal use and the other for distribution. See id. at 1373-74. Each stash therefore constituted a different criminal transaction. Id. at 1374.

We agree with Johnson's rationale. Applying it to the facts of this case, the methamphetamine in the cigarette package and the methamphetamine in the pill bottle were two separate caches of drugs; one was intended for distribution to Stratton at the truck stop, and the other was intended for some other purpose. Each stash therefore constituted a separate violation of the narcotics laws.

The government chose to prosecute Finley for the violation arising from the methamphetamine in the cigarette package only and not the methamphetamine in the pill bottle.[3] The lesser

_____

[3] We recognize that the indictment's language was general; it did not specifically refer to the methamphetamine in the cigarette package and did not by its language exclude the drugs in the pill bottle.

But the government's theory of the case was that, by driving

-11-

included offense of possession with intent to distribute the
methamphetamine in the cigarette package would be simple
possession of the <u>same</u> stash of methamphetamine.  But Finley's

---

Finley to the truck stop knowing that the purpose was for
methamphetamine distribution, Finley aided and abetted Brown's
possession with intent to distribute the methamphetamine in the
cigarette package.  And the arguments presented at trial made it
clear to both the jury and the judge that Finley was on trial for
the methamphetamine sold to Stratton and not for the
methamphetamine in the pill bottle.

    For example, in his closing argument, Finley's counsel told
the jury:

> They've got to prove to you that Jacob
> [Finley] in his mind knew what was going on
> when Mark Brown delivered [the
> methamphetamine].
>
> . . . .
>
> It's not what is in the orange bottle.
> There is no evidence of any intent to
> distribute that.  It's what was given—sold to
> Amy Stratton.
>
> . . . .
>
> Now, we know <u>[Finley] is only accused of
> this one delivery to Amy Stratton</u>.
>
> There is no evidence that the
> methamphetamine in that orange prescription
> bottle, the orange cap, involved intent to
> distribute at all.  There is no evidence of
> that.  Nor on the residue, the little tiny
> traces, in the one with the white cap.

    Counsel for the government did discuss the pill bottles found
in Finley's van, but she did so only to demonstrate Finley's
knowledge of Brown's methamphetamine dealing and to question
Finley's credibility.  The government never asserted that the jury
could convict Finley on the basis of the methamphetamine in the
orange-capped pill bottle or that Finley intended to distribute
this methamphetamine.

-12-

argument rests solely on the methamphetamine in the pill bottle;

he does not contend, nor did he before the trial court, that he

is entitled to a lesser-included-offense instruction on simple

possession of the methamphetamine in the cigarette package.  Even

if he did, on the evidence presented at trial, a jury could not

rationally have convicted Finley of simple possession of this

cache of methamphetamine and yet have acquitted him of possession

with intent to distribute it.  This is because the only issue at

trial was Finley's knowledge of Brown's plan——i.e., whether

Finley drove Brown to the truck stop knowing of Brown's plan or

did so completely unwittingly.[4]  If Finley knew beforehand that

the purpose of the trip to the truck stop was to distribute

_____

[4] During her closing argument, counsel for the government
framed the issue as follows:

> The only question in this case is: Did
> the Defendant know what was going on on August
> 19th of 2005?  That's the only question for
> you to decide because it is undisputed that he
> participated in the possession with intent to
> distribute on August 19th of 2005.  The only
> question is his knowledge.  That's what you
> are going to have to decide.

Likewise, in his opening statement, Finley's counsel
presented the issue as follows:

> [W]hat is this case about?  It's about what
> was in Jacob Finley's mind . . . .
>
>      . . . Did he know beyond a reasonable
> doubt that Mark Brown was about to deliver
> methamphetamine to Amy Stratton, this lady,
> this informant?  Did he know a drug
> transaction was about to occur?

-13-

methamphetamine, then he is criminally liable for the greater offense of possession with intent to distribute; if Finley did not know this, then he is liable for neither the greater offense of possession with intent to distribute nor the lesser offense of simple possession. The additional element required for a conviction on the greater offense—here, intent to distribute the methamphetamine in the cigarette package—was not in dispute, and Finley was therefore not entitled to an instruction on the lesser offense. See Sansone, 380 U.S. at 349.

### III. WARRANTLESS SEARCH OF CELL PHONE

Finley next contends that the call records and text messages recovered during the search of his cell phone should have been suppressed.

### A. Standing

The government suggests that Finley lacks standing to challenge the search of the cell phone. The government asserts that Finley did not have a reasonable expectation of privacy in the cell phone because it was a business phone issued to him by his uncle's business. We disagree.

In determining whether a defendant has a reasonable expectation of privacy sufficient to contest the validity of a search, we inquire "(1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and

-14-

(2) whether that expectation of privacy is one which society would recognize as reasonable."  United States v. Cardoza-Hinojosa, 140 F.3d 610, 614 (5th Cir. 1998) (quoting United States v. Kye Soo Lee, 898 F.2d 1034, 1037-38 (5th Cir. 1990)). The factors we consider include

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy[,] and whether he was legitimately on the premises.

Id. at 615 (quoting United States v. Ibarra, 948 F.2d 903, 906 (5th Cir. 1991) (first alteration in original)).

The district court found that, although Finley's employer issued him the cell phone, Finley nonetheless maintained a property interest in the phone, had a right to exclude others from using the phone, exhibited a subjective expectation of privacy in the phone, and took normal precautions to maintain his privacy in the phone.  We review these findings for clear error. Id. at 613 (citing United States v. Kelley, 981 F.2d 1464, 1467 (5th Cir. 1993)).  The district court also determined that Finley had standing to contest the search.  We review this conclusion de novo.  Id.

The government concedes that Finley had a possessory interest in the cell phone and that his use of the phone weighs in favor of his right to challenge the search.  The sole basis

-15-

for the government's argument appears to be that Finley's employer, not Finley, had a property interest in the phone and that Finley should have expected the employer to read the messages on the phone after he returned it to the employer.[5] But a property interest in the item searched is only one factor in the analysis, and lack thereof is not dispositive. See, e.g., Mancusi v. DeForte, 392 U.S. 364, 368 (1968) ("[C]apacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."); see also Cardoza-Hinojosa, 140 F.3d at 615 ("[N]o one of [the Ibarra] factors is necessarily decisive . . . .").

The district court did not clearly err in finding that Finley had a right to exclude others from using the phone. That Finley's employer could have read the text messages once he returned the phone does not imply that a person in Finley's position should not have reasonably expected to be free from intrusion from both the government and the general public. Further, the government stipulated that Finley's employer permitted him to use the phone for his own personal purposes. And we see no error in the district court's finding that Finley

_____

[5] Although the district court found that Finley had a property interest in the phone, it appears that Finley's interest was possessory only and that his employer had the property interest in the phone.

-16-

took normal precautions to maintain his privacy in the phone, despite the government's protestation that the phone was not password protected.  In these circumstances, we conclude that Finley had a reasonable expectation of privacy in the call records and text messages on the cell phone and that he therefore has standing to challenge the search.

**B. Search Incident to Lawful Arrest**

Although Finley has standing to challenge the retrieval of the call records and text messages from his cell phone, we conclude that the search was lawful.  It is well settled that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."  United States v. Robinson, 414 U.S. 218, 235 (1973). Police officers are not constrained to search only for weapons or instruments of escape on the arrestee's person; they may also, without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial.  See id. at 233-34.  The permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person.  United States v. Johnson, 846 F.2d 279, 282 (5th Cir. 1988) (per curiam); see also New York v. Belton, 453 U.S. 454, 460-61 (1981) (holding that police may search containers, whether open or closed, located within arrestee's

-17-

reach); <u>Robinson</u>, 414 U.S. at 223-24 (upholding search of closed cigarette package on arrestee's person).

Finley concedes that the officers' post-arrest seizure of his cell phone from his pocket was lawful, but he argues that, since a cell phone is analogous to a closed container,[6] the police had no authority to examine the phone's contents without a warrant. He relies on <u>Walter v. United States</u>, 447 U.S. 649 (1980), for this proposition. <u>Walter</u>, however, is inapposite because in that case no exception to the warrant requirement applied, <u>see</u> <u>id.</u> at 657, whereas here no warrant was required since the search was conducted pursuant to a valid custodial arrest, <u>see</u> <u>Robinson</u>, 414 U.S. at 235. Special Agent Cook was therefore permitted to search Finley's cell phone pursuant to his arrest.[7] <u>Cf.</u> <u>United States v. Ortiz</u>, 84 F.3d 977, 984 (7th Cir.

---

[6] Finley cites <u>United States v. Chan</u>, 830 F. Supp. 531, 534 (N.D. Cal. 1993) (analogizing numbers in pager's memory to contents of closed container). Although Finley relies on this case, the <u>Chan</u> court concluded that police officers may, incident to the defendant's arrest, retrieve numbers from the memory of a pager seized from the defendant's person. <u>See</u> <u>id.</u> at 535-36.

[7] The fact that the search took place after the police transported Finley to Brown's residence does not alter our conclusion. <u>Cf.</u> <u>United States v. Edwards</u>, 415 U.S. 800, 803 (1974) ("[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."). In general, as long as the administrative processes incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest. <u>United States v. Ruigomez</u>, 702 F.2d 61, 66 (5th Cir. 1983) (citing <u>Edwards</u>, 415 U.S. at 804). Although the police had moved Finley, the search was still substantially contemporaneous with his arrest and was therefore permissible.

-18-

1996) (upholding retrieval of information from pager as search incident to arrest).  The district court correctly denied Finley's motion to suppress[8] the call records and text messages retrieved from his cell phone.

### IV. FINLEY'S POST-ARREST INTERVIEW

### A. Police Statements Challenging Finley's Truthfulness

Finley contends that the district court abused its discretion by denying his request for a limiting instruction regarding a witness's comment on his veracity.

### 1. Background

During the course of Finley's post-arrest interview at Brown's residence, Finley initially denied that he had ever

---

Likewise, United States v. Chadwick, 433 U.S. 1 (1977) is inapplicable.  Chadwick held that,

> [o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

433 U.S. at 15 (emphasis added).  Finley's cell phone does not fit into the category of "property not immediately associated with [his] person" because it was on his person at the time of his arrest.

[8] Although Finley initially advanced his arguments in a motion in limine, the district court treated the motion as a motion to suppress, and Finley orally moved to suppress the contents of the cell phone at the pretrial conference.

distributed methamphetamine.  Special Agent Cook and Sergeant

Russell confronted Finley with a text message on his phone that

read, "Call Mark I need a 50."  Finley told them that "50"

referred to an ounce (fifty dollars' worth) of marijuana, not

methamphetamine.  Special Agent Cook and Sergeant Russell

challenged Finley's assertion that an ounce of marijuana costs

fifty dollars.  The following exchange then occurred:

> Sgt Russell:    I'll tell you what, you better
> start telling the truth.
>
> Finley:         I'm telling the truth, sir.
>
> Sgt Russell:    No you['re] not.
>
> SA Cook:        No you['re] not telling us the
> truth.

A recording of the interview and a transcript of the recording

were admitted at trial.

At the charge conference, Finley requested that the court

instruct the jury to disregard Special Agent Cook's and Sergeant

Russell's comments about Finley's veracity.  The district court

denied Finley's request, reasoning that the officers were simply

trying to get the most accurate statement possible from their

interview of Finley and that the statements were not being

offered to bolster the evidence or to accuse Finley at trial.

**2. Standard of Review**

We review a properly preserved challenge to jury

instructions for abuse of discretion.  United States v. Daniels,

281 F.3d 168, 183 (5th Cir. 2002) (citing <u>United States v. Huynh</u>, 246 F.3d 734, 738 (5th Cir. 2001)).  But when the issue was not properly raised before the district court, our review is for plain error.  <u>Id.</u> (citing <u>United States v. Caucci</u>, 635 F.2d 441, 447 (5th Cir. Unit B Jan. 1981)).

At the time the recording and transcript were admitted into evidence, Finley did not object on the basis that the statements improperly permitted one witness to opine on the veracity of another.  The government argues that our review is consequently for plain error only.  But Finley did request later at the charge conference that the jury be instructed to disregard any comments about Finley's veracity.  We need not resolve, however, whether Finley preserved his argument because, as we explain below, even under an abuse-of-discretion standard we discern no reversible error.

**3. Analysis**

Relying on <u>United States v. Freitag</u>, Finley maintains that a limiting instruction was necessary because the transcript of the interview involved a witness discussing the veracity of the accused.  <u>See</u> 230 F.3d 1019, 1024 (7th Cir. 2000) ("Because credibility questions are for the jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness." (citing <u>United States v. Cole</u>, 41 F.3d 303, 308 (7th Cir. 1994); <u>United States v. Sullivan</u>, 85 F.3d 743, 749-50 (1st

Cir. 1996))). Finley also relies on <u>United States v. Dotson</u>, 799 F.2d 189 (5th Cir. 1986), which discusses the propriety of offering opinion evidence to impeach the credibility of a witness at trial. But these cases are inapposite because the challenge to Finley's truthfulness occurred in a pretrial interview, not at trial during a witness's testimony.[9]

The district court did not abuse its discretion by denying Finley's request to instruct the jury to disregard Special Agent Cook's and Sergeant Russell's remarks. Special Agent Cook and Sergeant Russell certainly accused Finley of being untruthful, but it was done in the context of police questioning, and the jury was permitted to hear the comments in their context. The jury would certainly have understood that the officers investigating Finley would not have believed him, and the jury would not have afforded those officers' remarks in the context of the interview any more weight than they would have afforded the fact that the government also disbelieved him and decided to prosecute him. <u>Cf.</u> <u>Dubria v. Smith</u>, 224 F.3d 995, 1001-02 & n.2 (9th Cir. 2000) (en banc) (concluding in habeas review that trial court did not err by refusing to redact portions of a tape and transcript wherein a detective, inter alia, made statements of disbelief of the defendant's story in the context of pretrial

_____

[9] Special Agent Cook testified at trial, but he did not opine on the witness stand that Finley was untruthful. Sergeant Russell did not testify.

-22-

police questioning because the questions and comments placed the defendant's answers in context, there was nothing in the detective's statements that suggested evidence or theories of the case that were not presented at trial, and the jury would give the statements "no more weight than they would the fact [the defendant] was charged by the prosecutor with murder or that the prosecutor clearly also disbelieved [the defendant]").[10]

## B. Rule 404(b) Evidence

### 1. Background

Finley finally contends that the district court erred by admitting evidence of his prior drug use and distribution. During Finley's interview with Special Agent Cook and Sergeant Russell, Finley admitted that he had used methamphetamine he received from Brown on two prior occasions: once in high school[11] and once three days prior to his arrest. He also admitted to cocaine use once in high school. He admitted to getting his

---

[10] Finley mischaracterizes <u>Dubria</u>'s analysis. He asserts that the statements were permissible in that case only because the error was cured by the judge's limiting instructions. But the <u>Dubria</u> court did not rely on the limiting instructions as the basis for its holding. Instead, after concluding that there was no error, the court stated that "even if" it was error to admit the tapes and transcripts without redacting the detective's accusatory statements, any error was cured by the limiting instructions. 224 F.3d at 1002.

[11] Finley was at least a year out of high school.

friends marijuana from Brown so many times that he "couldn't count," and he said that on one of those occasions, two to three weeks earlier, the bag from Brown that was supposed to contain entirely marijuana had some small shards of methamphetamine in the bottom.  Finley objected to the inclusion of these statements in the recording and transcript of his interview.  Additionally, Brown testified that during the approximately six months prior to his arrest, he had sold Finley methamphetamine five to ten times and that Finley had distributed some of this methamphetamine; Finley objected to this testimony as well.  The district court overruled Finley's objections, concluding that the evidence was admissible under Rule 404(b) of the Federal Rules of Evidence, although the court did give the jury a limiting instruction prior to the recording of the interview being played for the jury and again in the jury charge.

### 2. Standard of Review

We review a district court's decision to admit Rule 404(b) evidence in a criminal case under a heightened abuse-of-discretion standard.  United States v. Jackson, 339 F.3d 349, 354 (5th Cir. 2003) (citing United States v. Wisenbaker, 14 F.3d 1022, 1028 (5th Cir. 1994)).  Even if the district court abused its discretion, reversal is not proper if the error was harmless.  Id. (citing United States v. Torres, 114 F.3d 520, 526 (5th Cir. 1997)).

**3. Analysis**

Evidence of other crimes, wrongs, or acts is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). We analyze the admissibility of evidence under Rule 404(b) in a two-step inquiry. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

Evidence of Finley's past methamphetamine purchases from Brown and his past distributions of narcotics were relevant to show Finley's motive and intent. The central issue at trial was whether Finley intended to aid and abet Brown's methamphetamine distribution to Stratton by driving Brown to the truck stop. Finley's recent assistance in Brown's distribution of narcotics was relevant to show Finley's intent to assist him on the day of the sale at the truck stop. And evidence of Finley's recent use of methamphetamine he bought or received from Brown was relevant to show Finley's motive—i.e., he agreed to drive Brown to the truck stop in exchange for extra methamphetamine. Moreover, the district court did not err by concluding that any undue prejudice

-25-

did not substantially outweigh the evidence's probative value.

The district court may, however, have abused its discretion by admitting evidence of Finley's cocaine and methamphetamine use while he was in high school.  Cf. United States v. McDonald, 905 F.2d 871, 875 (5th Cir. 1990) (concluding that evidence of defendant's past speed and cocaine use was not admissible to show defendant's knowledge that his car contained marijuana); United States v. Jimenez, 613 F.2d 1373, 1376 (5th Cir. 1980) (reviewing a conviction for heroin distribution and concluding that undue prejudice substantially outweighed probative value of evidence of cocaine possession one year later).

But we conclude on these facts that any error was harmless. There was more than sufficient proof of Finley's guilt absent this evidence, and any harm was minimized by the court's two admonishments to the jury to consider the evidence for very limited purposes only.  See United States v. Taylor, 210 F.3d 311, 318 (5th Cir. 2000) ("[P]rejudicial effect [of Rule 404(b) evidence] may be minimized by a proper jury instruction.").

## V. CONCLUSION

For the foregoing reasons, Finley's conviction is AFFIRMED.